UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEAN P. VALENTE,

        Plaintiff,

v.

MONARCH LIFE INSURANCE
COMPANY,

        Defendant.

_____/

Case No. 2:22-cv-10806

Magistrate Judge Kimberly G. Altman

## <u>OPINION AND ORDER GRANTING</u><br><u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 18)</u>

I.      Introduction

This is a disability insurance case.  Plaintiff, attorney Dean P. Valente (Valente), alleges that he suffered a disabling injury on a flight from Florida to Detroit.  (ECF No. 1-1).  Valente sued his disability insurance carrier, Monarch Life Insurance Company (Monarch), in state court for total disability insurance coverage.  Monarch removed the case to federal court based on diversity jurisdiction.  *See* ECF No. 1.  Both parties consented to the undersigned's authority.  (ECF No. 9).

Before the Court is Monarch's motion for summary judgment on Valente's claims.  (ECF No. 18).  Monarch argues that Valente failed to provide timely proof

of loss documents as required under the insurance policy (the Policy) and

Michigan law, and that Valente continued to work as an attorney after his injury

and is not totally disabled, as he alleges.  (*Id.*).  The motion is fully briefed.  (ECF

Nos. 21, 22).  A hearing was held on June 22, 2023.

For the reasons that follow, the Court finds that there are no genuine issues

of material fact that Valente did not provide sufficient proof of loss and did not

suffer a totally disabling injury.  Therefore, Monarch's motion for summary

judgment will be GRANTED.

## II.     Background

### A.     Factual Allegations

As alleged in the complaint, on January 17, 2020, Valente was flying on a

commercial airline from Florida to Detroit when he felt what he describes as a pop

in his left ear.  (ECF No. 1-1, PageID.10).  Thereafter, Valente experienced some

mild dizziness and felt like his equilibrium was thrown off.  Symptoms worsened

as the weeks progressed.  He also experienced some attendant hearing loss that

also worsened with time, in addition to the onset of tinnitus.  Over the following

months, Valente alleges that his condition developed into a chronic daily disability

which greatly limited his ability to perform his job as a trial attorney.  He feels he

can no longer represent clients to the best of his ability.  (*Id.*).

Valente has had numerous evaluations and treatments for his condition after

suffering this injury.  He was evaluated by an ear, nose, and throat (ENT) specialist

as well as a neurotology expert with the Michigan Ear Institute.  He underwent

audiometric testing and other diagnostic tests including an MRI and distributor

function testing.  For treatment, Valente underwent vestibular therapy on several

occasions and tried non-medical treatments such as yoga in order to improve his

balance, but it did not help.  He was fitted for a hearing aid in July 2020.  He also

underwent pharmacological treatment by taking Topamax for his disequilibrium,

but it had no effect.  Valente's sleep has also been disrupted by his tinnitus, but he

is treating this with sleep medication.  (*Id*., PageID.11).

At all relevant times, Valente was covered by disability insurance through

Monarch.  (*Id*., PageID.10).  At Monarch's request, Valente submitted to an

independent medical examination (IME) on August 25, 2021, by Gregory Artz,

M.D. (Dr. Artz).  (*Id*., PageID.11).  The IME revealed chronic profound left-side

sensorineural hearing loss (SNHL), chronic left peripheral vestibular disorder,

chronic dizziness, chronic left tinnitus, and sleep disorder secondary to tinnitus.

(*Id*., PageID.12).  Dr. Artz found that Valente's symptoms and delayed progression

were consistent with an active perilymphatic fistula[1] caused by cabin pressure

---

[1] "A perilymphatic fistula refers to a tear or defect in the membranes that separate
your middle ear and inner ear.  People with a perilymphatic fistula may notice
several symptoms, including a feeling of fullness in their ear, hearing loss and
vertigo."  https://my.clevelandclinic.org/health/diseases/22383-perilymphatic-
fistula (last accessed July 12, 2023).

during the January 17, 2020 flight.  (*Id*., PageID.12-13).

Valente complains that his one-sided hearing loss makes it difficult to work in the courtroom setting and that his hearing aid does not offer much improvement in this regard.  (*Id*., PageID.12).  He also complains that his dizziness is made worse when active and in motion, which is further disabling.  (*Id*., PageID.11).  Valente contends that despite his disability and compliance with the Policy, including his timely premium payments and the August 2021 IME, Monarch has wrongfully denied him disability coverage and payment of benefits, constituting a breach under the Policy.  (*Id*., PageID.13).

B.      Disability Income Policy

The Policy that Valente purchased from Monarch in May 1990 is attached to both the complaint and Monarch's motion.  Section 2 of the Policy defines the contours of both total disability and residual disability.  It states that one is totally disabled if

> **You are unable to do the substantial and material duties of your regular occupation.**  Your *regular occupation* is your usual work when total disability starts.  If you are retired and not working when total disability starts, your regular occupation will be the normal activities of a retired person of like age.

(ECF No. 18, PageID.151 (emphasis in original)).  It further states that one is residually disabled if

> • You are able to do some, but not all, of the substantial and material duties of his regular occupation, or you are able to do all

4

of the substantial and material duties of your regular occupation but for less than full time.

- You are working, and your earnings during a month do not exceed 80% of your pre-disability earnings.

- Your residual disability results from sickness or injury.

- You are receiving medical care from a doctor which is appropriate for the injury sickness.

(*Id*., PageID.152).  Section 2 of the Policy further requires that a claimant provide Monarch with "reasonable proof of any loss of earnings."  (*Id*.).

Section 6 of the Policy outlines Monarch's specific proof of loss requirements, which Monarch argues Valente did not meet.  It requires written proof of loss within 90 days of the occurrence, but states that Monarch will not deny claims so long as they are brought within a year of the expiration of this time limit.  (*Id*., PageID.152-153).  It also prohibits any legal action against Monarch until 60 days after the required proof of loss has been provided.  (*Id*.).

### III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the

light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotation marks omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.   Discussion

As explained above, Monarch raises two issues on summary judgment: (1) that Valente did not provide Monarch with sufficient proof of loss documents; and (2) that Valente was not totally disabled under the Policy, as he continued to work

6

as an attorney after his injury.[2]

### A.    Proof of Loss

#### 1.    Standard

In Michigan, the law does not require perfect compliance with the Policy to

obtain benefits, only "substantial compliance."  *Korn v. Paul Revere Life Ins. Co.*,

382 F. App'x 443, 447 (6th Cir. 2010); *Westfield Ins. Co. v. Appleton,* 132 F.

App'x 567, 574 (6th Cir. 2005).  Substantial compliance with proof of loss

requirements must fulfill three intended purposes:

> (1) allowing the insurer an opportunity to investigate the loss;

> (2) allowing the insurer to estimate its rights and liabilities; and

> (3) preventing fraud.

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 108 F. Supp. 3d 543, 571 (E.D. Mich.

2015) (Lawson, J.).  "[S]ubstantial compliance requires more than a minimal

effort."  *Wineholt v. Cincinnati Ins. Co.,* 179 F.Supp. 2d 742, 748-49 (W.D. Mich.

---

[2] Monarch also argues, in its reply brief, that Valente's response and counter-motion should be stricken, as his response came four days after the allowed response time, and his counter-motion came 25 days after the dispositive motion deadline.  (ECF No. 22, PageID.957-958).  In the interest of deciding the case on the merits, the Court has considered the arguments raised in Valente's response, but will not consider Valente's counter-motion for summary judgment, as it was filed well-after the dispositive motion deadline and Valente did not seek leave to file a late dispositive motion.  That said, because the counter-motion addresses the same arguments presented in Monarch's motion, all of Valente's arguments have been considered.

2001) (Quist, J.).  "The insured should make a reasonable effort to provide information reasonably within its possession and with a sufficient degree of particularity to allow the insurer to make an informed review of the claim."  *Id*.

## 2.   Proof of Loss Documents

Monarch has attached a large amount of communications between itself and Valente regarding his claim, arguing that at no point did he substantially comply with the proof of loss requirements.  That evidence is summarized below.

Valente initiated his claim on May 27, 2020.  (ECF No. 18-3).  A Monarch representative called Valente that day to explain the proof of loss requirements. (*Id*., PageID.204).  According to Monarch's "Action Log," the representative explained that the date of disability would be the date he stopped working, was under the care of a physician, and had submitted medical documentation supporting his disability claim.  (*Id*.).  The representative further explained the need for Valente's tax returns in order to document his income and occupational duties prior to his claim.  (*Id*.).  Valente informed the representative that due to a frozen pipe bursting in his home office in 2018, he lost his records from that year and had not yet filed his 2018 or 2019 tax returns but could send his 2017 tax return to Monarch.  (*Id*.).  The representative responded that Valente could send his 2017 tax return, but that he would also need to supply further documentation to support his work activity, such as "app[ointment]t books, court schedules, or

8

whatever info[rmation] [Valente] feels would help document his occupation as a lawyer."  (*Id*.).

On June 12, 2020, Valente submitted his claim forms, along with a letter and tax returns from 2017.  (ECF No. 18-4).  Valente explained again that there was an incident that destroyed his recent personal and business records and that his 2018 and 2019 tax returns had not yet been filed.  (*Id*., PageID.207).  He also noted that his CPA and tax preparer had unexpectedly retired, and Valente could not contact him for assistance.  (*Id*.).

In his claim form, Valente detailed the cause and symptoms of his allegedly disabling injury.  (*Id*., PageID.210-211).  For the occupational description section, Valente wrote that his title was "attorney" and described his work as follows:

> Trial Attorney involving criminal, real estate and business matters from initial client intake through development of customary and unique case strategies involving various aspects of transaction negotiations; contracts; alternative dispute resolution; pre-trial litigation practices; bench and jury trials; post-adjudication matters; governmental agency petitions; and, office management.

(*Id*., PageID.212).  He noted that his work involved use of motor vehicles, computers, files, cameras, case specific equipment and tools, and audio/video systems.  (*Id*.).  He wrote that he typically worked four-to-six days per week, and six to nine hours daily; as to his hours spent doing the "trial attorney" work described above, he answered "varied."  (*Id*.).  He also wrote "varied" for his average trip distance and his hours spent each day sitting, standing, walking, and

driving.  (*Id*., PageID.213).

Monarch responded to Valente's claim on June 25, 2020, with a letter requesting more information.  (ECF No. 18-5).  Specifically, Monarch requested information regarding Valente's claimed net operating loss of $30,142 as shown in his 2017 tax return, as well as the following information to substantiate his occupational duties prior to his alleged disability:

> Any records showing the number of hours spent on each case.  Your appointment books showing your appointments.  Any time sheets/ records for the cases in which you were entitled to attorney's fees.  Any fee applications.  Any computer-generated time management worksheets and any budgets you may have prepared for your clients. Please also provide a listing of all cases filed in 2018, 2019 and 2020 along with their current dispositions.

(*Id*.).  The letter also stated, "[w]hile we understand that attorney-client privilege applies to your cases, any information that you feel would be helpful in documenting your duties as an Attorney is greatly appreciated."  (*Id*.).

Valente responded on July 5, 2020.  (ECF No. 18-6).  He explained that he was not sure how his former CPA prepared his 2017 taxes so as to have a net operating loss, and that he was assured when signing up for the Policy that his income had nothing to do with his disability coverage.  As to the requested information regarding his proof of loss, Valente explained that the bulk of his records for anything prior to February 2019 had been destroyed, and that, nevertheless, providing the requested information to Monarch would require

written waivers from each client and would otherwise violate their attorney-client privilege. He asserted that he has practiced law in good standing for over 35 years, served as a circuit court mediator and case evaluator, and has continuously pursued the practice of law for "hundreds and hundreds and hundreds of clients." (*Id.*).

On July 7, 2020, Monarch provided Valente with a detailed explanation of why his tax returns and proof of his occupation and job duties were necessary to substantiate his claim. (ECF No. 18-7). The letter explained that though disability insurance is not dependent on Valente's income, "[o]ne way to document one[']s 'usual work' is by reviewing sources of income, which is why [Monarch has] requested your tax returns and asked for clarification of the Net Operating Loss in 2017." (*Id.*, PageID.227). The letter stated further, "[s]ince tax information [from 2018 and 2019] is not available to help us document your occupation, [Monarch] ask[s] for your assistance in providing [it] with other information from February 1, 2019 to present to help document your 'usual work' at the start of your claimed disability." (*Id.*). Suggested documentation included:

> Copies of your appointment books showing your appointments with client names redacted. Copies of time sheets/records for the cases in which you were entitled to attorney fees. Copies of fee applications. Copies of your business bank statements. Any time management worksheets and any budgets you may have prepared for your clients. Any other information that you feel will help us document your occupation as an attorney. Again, you may redact any information that you feel is confidential.

> In your email you also indicate that you are "a circuit court

11

mediator/case evaluator."  Please provide us with any 1099's for 2018 and 2019 that you may have received from the circuit court for these cases so that we may document your work as such.

(*Id.*, PageID.228).

On July 20, 2020, Valente provided the only additional documentation of his work prior to injury other than tax returns.  (ECF No. 18-8).  He provided three pages of case names and numbers from the years 2018, 2019, and 2020, that he had allegedly worked on.  (*Id.*, PageID.231-233).  This "case docket" contained no additional information regarding the cases, such as which party Valente represented, what work he did on any particular case, how many hours he spent on a case, or which jurisdiction the case was in.  By way of example, a portion of the "2018 Case Docket" appears as follows:

| | |
|---|---|
| People v Raad Ausi | 18-0011-OM |
| People v | 17-87488-1-OM |
| People v Juanita Ross | 17-87077-1-OM |
| People v David Pesek | 18-86298-1-SM |
| Sandy Pensler for US Senate | B-0328-0218 |
| People v Wendy Suma | 17-35650M-OM |
| People v Jeremiah J. Cannon | C-16-1558-OM |
| People v DeShawn A. Dudley | 16-86356-ST |
| People v DeJuan Parkman | 18-88140-SM |
| People v Ellen Bowen | 18-101999-A |
| People v Ellen Bowen | 18-101999-B |
| People v Ellen Bowen | 18-101999-C |
| People v Paige Verbrugge | 18Z439619A-OI |
| East Lake Properties v QUIZZO | 17-1863-GC |
| Russell v Stepek | 1934810S1 |
| Tim Sever v SOS | |
| People v Cody Dawson | |
| Dobbins v McCain | 17-003697-CK |

(*Id.*, PageID.231).

Monarch wrote back to Valente on August 10, 2020.  In that letter, Monarch again requested further documentation of Valente's prior work, including

> copies of your appointment books showing your appointments (with client names redacted), time sheets/records for any matters that you handled for clients, fee applications, business bank statements with check registers, time management worksheets, any case budgets you may have prepared for your clients, and any other information that you feel will help us document your occupational duties as an attorney.

(ECF No. 18-9, PageID.236).  Additionally, given Monarch's unaddressed concerns about Valente's $30,142 net operating loss from 2017, Monarch requested additional tax forms from Valente.  (*Id.*).  Alternatively, Monarch provided authorization forms that Valente could sign and return, giving Monarch the ability to obtain his tax information directly from the IRS.  (*Id.*, PageID.237). Lastly, Monarch informed Valente that it had discovered he had a real estate broker's license and a possible association with DMV Properties, LLC, and requested information regarding this potential prior work of his as well.  (*Id.*, PageID.236).[3]

Having received no response, Monarch sent a letter to Valente on September

---

[3] While Valente admitted at deposition to being a licensed real estate broker, (ECF No. 18-10, PageID.240), the Dean Valente associated with DMV Properties, LLC appears to be a different individual with the same name, (ECF No. 18-12, PageID.256).

10, 2020, noting that it was still "awaiting a response in regard to the additional information requested in [the] letter dated August 10, 2020." (ECF No. 18-11, PageID.252).

On November 24, 2020, Monarch sent a similar letter to Valente's attorney, Gregory J. Rohl (Rohl), who was apparently retained on or around October 8, 2020. (*Id*., PageID.253). Monarch sent a second, similar letter to Rohl on January 14, 2021. (*Id*., PageID.254).

On January 21, 2021, Rohl responded to Monarch's January 14, 2021 letter. In his response, Rohl did not provide additional documentation of Valente's prior work, but demanded that the "benefits be paid immediately," and explained that, "[a]s for what a trial attorney does I am sure you have seen enough Perry Mason or Law and Order episodes to understand." (ECF No. 18-12, PageID.256).

In March, May, and October of 2021, Monarch made additional requests for the same or similar information it had previously requested from Valente and Rohl. (ECF No. 18-13). In the May 2021 letter, Monarch stated that it was still researching the case docket Valente had submitted and requested dates and identifying information for the last five trials and court appearances at which Valente argued substantive motions. (*Id*., PageID.262). In the October 2021 letter, Monarch explained that without documentation of the nature and extent of his activities as a trial attorney, court appointed mediator, and law school professor

14

(Valente's "LinkedIn" profile indicated that he was an Adjunct Professor of Criminal Law Clinical Studies at University of Detroit Mercy School of Law), Monarch would be "unable to evaluate the extent to which Mr. Valente's courtroom duties constituted the substantial and material duties of his occupation as an attorney. That evaluation is an essential prerequisite to Monarch's ability to determine Mr. Valente's eligibility for disability benefits under his policy." (*Id.*, PageID.264).

On October 12, 2021, Rohl responded to the Monarch claims department via email, writing that while he "personally believe[s] the proofs clearly demonstrate total disability, [Monarch has] neglected to include and incorporate" the residual disability language of the Policy. (ECF No. 18-14, PageID.269). Days later, on October 20, 2021, Monarch responded with a letter indicating that its focus was on "total disability," not "residual disability," because that is how Valente had consistently characterized his claim. (ECF No. 18-15). Monarch noted several questions and correspondences from Valente indicating that he claimed to have stopped working entirely following his injury, either on February 20 or March 10 of 2020, which is consistent with a claim for total disability. (*Id.*, PageID.271). Monarch's Action Log indicates that Rohl spoke to a Monarch representative on November 8, 2021, stating that Valente "would like to take an 'intermediary position as [he] continues to work in a limited capacity.' " (ECF No. 18-3,

15

PageID.203).  Monarch never received the documents it requested in the October 2021 letter or the November 2021 correspondence regarding a claim for residual disability benefits.

On November 15, 2021, Monarch sent another letter to Rohl, noting that 12 prior letters had been sent to either him or Valente outlining the documentation needed to substantiate Valente's disability claim.  (ECF No. 18-16).  Later that month on November 29, 2021, Monarch emailed Rohl, noting that Valente's recent tax returns had finally been sent to Monarch from the IRS.  (ECF No. 18-17).

On December 6, 2021, Monarch advised Rohl that Valente's 2018 and 2019 tax returns indicate that he had performed only limited work during those years and that they did not support his claim that his regular occupation was as a "trial attorney."  (ECF No. 18-18).  As such, Monarch referred back to its October 2021 letter to Rohl and stated that it awaits receipt of the necessary documentation as described in that letter.  (*Id.*).  The tax returns themselves indicated that Valente earned only $9,365 in 2018 and $11,960 in 2019.  (ECF No. 20 (sealed tax returns)).

On February 9, 2022, Monarch sent a letter to Rohl noting that it had received no response to its October 2021 letter requesting additional information.  (ECF No. 18-19).  Accordingly, Monarch closed Valente's claim on that date as it was unable to verify Valente's asserted occupation prior to his claimed date of

disability.  (*Id*.).

In sum, over the course of 20 months, Monarch sent Valente or his counsel at least 13 letters requesting additional information regarding Valente's work before and after his injury.  Valente responded, either himself or through counsel, with four emails or letters to Monarch, in addition to an occasional telephone call. For actual documents provided to Monarch, Valente submitted his 2017 tax returns, authorized access to his 2018 and 2019 tax returns, and provided the "case docket" described above.

### 3.      Analysis

Monarch says this case is similar to *Korn v. Paul Revere Life Ins. Co.*, No. 04-CV-70821, 2008 WL 5448213 (E.D. Mich. Dec. 31, 2008), *aff'd,* 382 F. App'x 443 (6th Cir. 2010).  In *Korn*, under a similar policy, an insurance provider requested proof of loss documents from the plaintiff—an attorney—who alleged total disability and sought benefits.  *Id*. at *1.  That policy required that

> [w]ritten proof of loss must be sent to Us within 90 days after the end of a period for which You are claiming benefits . . . We can also require reasonable proof from You of Your:
>
> > a. Prior Earnings; and
> >
> > b. Monthly Earnings for the month for which Disability is claimed.
>
> This may include personal and business tax returns, financial statements, accountant's statements or other proof acceptable to Us.

*Korn*, at *7.  The policy also provided that the insurer's obligation to make payments to an insured began only after it received "satisfactory" proof of loss.  *Id*.

Upon receiving the plaintiff's claim for benefits, the defendant insurer requested business and personal tax returns from the prior two years, profit and loss statements from the most recent year, and "a list of the captions for all court cases [he] tried within the last 12 months. . . ."  *Id*. at *7.  In his claim, the plaintiff stated his occupation as "Court Appearances.  Hours Spent Each Week: Varies. Description: In the 12 months prior to my disability I appeared in court at least 20 times."  *Id*.

The insurer moved for summary judgment, arguing that the plaintiff had failed to comply with the proof of loss requirements.  In response, the plaintiff admitted that he did not provide these documents, arguing that they were "not relevant to determine the occupation of [the plaintiff] at the time he became disabled. . . ."  *Id*.  Similar to Valente, the plaintiff reasoned that the job description and medical information he provided were enough to substantiate his claim.

The district court rejected the plaintiff's argument, stating,

> the plaintiff's contention that the documents are irrelevant to the amount of the monthly disability benefit payable, or his actual disability, may be true, but it cannot be said that the requested proof of loss documents were irrelevant to confirming the occupation the plaintiff himself provided.  The plaintiff does not create a genuine issue of material fact regarding his failure to provide what he contends are irrelevant documents.

*Id*. (cleaned up).  The district court found it, "not surprising" that "the defendant sought to verify that the plaintiff actually appeared in court at least twenty times in the prior year and requested proof of loss documents which would verify the plaintiff's pre-disability occupation."  *Id*.  The district court therefore granted the insurer's motion for summary judgment.

The plaintiff appealed, again arguing that the documents he did not provide were unnecessary for the insurer to process his claim.  The Sixth Circuit disagreed and affirmed the district court, explaining that "[p]roof of [the plaintiff's] involvement in court proceedings leading up to his disability, and the extent of this involvement, was necessary for [the defendant] to determine if [the plaintiff's] disability negatively affected the manner in which he practiced law prior to his disability."  *Korn*, 382 F. App'x at 448.  Thus, the Sixth Circuit held that "no reasonable fact-finder could determine that Korn did substantially comply with the [proof of loss] requirement.  *Id*.; *see also Canu v. Nat'l Life Ins. Co*., No. 12-12838, 2013 WL 1883534 (E.D. Mich. May 6, 2013) (holding that the insured failed to provide sufficient proof of loss, such as requested sign-in sheets, schedules, and billing documents, because he declined to provide evidence as to the number of patients he saw before and after the disability date).

Monarch argues that the facts in this case are "almost identical" to those in *Korn*.  (ECF No. 18, PageID.167).  Here as in *Korn*, the *medical* documentation

regarding the plaintiffs' disabilities appears to have been sufficient, or at least accepted by the insurers as such.  However, both plaintiffs were deemed by their insurers to have not provided sufficient documentation of their *work* prior to injury. In both cases, tax returns from the prior two years were requested by the insurers, as well as additional documentation to substantiate the plaintiffs' claims regarding their court appearances and other work as attorneys.

Valente, unlike the plaintiff in *Korn*, eventually released the requested tax returns to Monarch, but they only raised more questions.  Valente's income as reflected in his tax returns was surprisingly low for an attorney, so Monarch understandably sought additional information to substantiate his prior work.  Other than a list of case names and numbers with insufficient information to verify the cases—and no information about what work Valente did on each case—Valente supplied no documentation to Monarch regarding his work prior to disability.[4] Based on the tax returns and case docket alone, Monarch "would have been unable

---

[4] In communications with Monarch, Valente suggested he was concerned with violating the attorney-client privilege by supplying Monarch with additional information regarding his cases.  However, as Monarch explains, documents such as invoices are only protected "to the extent that [they] contain[] *confidential client information* or *the opinions of counsel*."  *360 Const. Co. v. Atsalis Bros. Painting Co.*, 280 F.R.D. 347, 353 (E.D. Mich. 2012) (Lawson, J.) (emphasis added). Further, Monarch offered to accept redacted versions of the requested documents in order to alleviate any concerns regarding attorney-client privilege.  There is a wide gulf between the information Valente provided to Monarch and that which would be considered privileged.

to verify that [Valente's] involvement in his law practice diminished as a result of his disability." *Korn*, 382 F. App'x at 448.

When deposing Cheryl Rose (Rose), an Assistant Vice President in the Monarch Claim Department, and again at the motion hearing, counsel for Valente argued that Monarch could have "canvassed" the state bar for Valente's "P Number appearance tickets" in order to verify his trial attorney work.  (ECF No. 21, PageID.349-350).[5]  This argument does not carry the day.  First, it is Valente's burden, not Monarch's, to document and substantiate Valente's prior work. Second, Rose's deposition highlights Monarch's ultimately unsuccessful efforts to investigate Valente's claim:

> Q (Rohl). Did you actually go to any of the Court records where he lists the cases upon which he entered an appearance as the trial attorney of record?
>
> A (Rose). If you are referring to the case dockets he sent us, I believe it was for a period of three years, we did attempt to look those up but the information that was supplied was insufficient for us to really determine if those cases were really out there or what Mr. Valente's case involvement in those cases were.  We were unable to get very far with that information.
>
> Q. So you never canvassed the State Bar for his P Number appearance tickets?
>
> A. I am not sure exactly what you mean by that.  We did try to use his license number to research his involvement with various courts.

---

[5] Specifically, Rohl suggested going "to the State Bar of Michigan['s] docket sheet entries where . . . you put in a P number and it comes up with the docket entries where attorneys enter their appearances."  (ECF No. 21, PageID.350).

We attempted to document it using the information he provided us.

Q. What did you do?

A. I don't remember exactly.

Q. I don't see any of that documentation in the claim file.  Was that more recent than when we secured the claims file?

A. Once we got the paperwork from Mr. Valente, that three year list we just entered it into the computer and nothing came back.

Q. Can you give me an approximate timeline when you did that?

A. I don't remember.  It was right around the time that we got the paperwork in because we were trying to use that.  We were trying to use what Mr. Valente gave us to see if we could document what his occupation was.

Q. I didn't see anything in the file that I reviewed that referenced an investigation in that regard.  Can you put your hands on that right now somewhere.
A. Nothing was printed because we couldn't find anything.

Q. Did you ever just go to the State Bar of Michigan and go on their docket sheet entries where it shows where you put in a P number and it comes up with the docket entries where attorneys enter their appearances.  Did you ever do that?

A. I don't remember the exact website we went on.

Q. Would it be fair to say then at least at the time you were considering the application for benefits that you didn't confirm that Mr. Valente was indeed the attorney of record for litigants participating in Michigan Courts.  Is that fair?

A. We were unable to find we were unable to confirm.  Correct.

(ECF No. 21, PageID.349-350 (citing ECF No. 21-2, PageID.429-431)).

As noted above, substantial compliance requires a reasonable effort from *the insured* to "provide information reasonably within its possession and with a sufficient degree of particularity to allow the insurer to make an informed review of the claim." *Wineholt*, 179 F. Supp. 2d at 748-49.  Here, despite multiple requests over a period of 20 months, Valente did not meet his burden to substantiate his inability to work.  As in *Korn*, "no reasonable fact-finder could determine that [Valente] did substantially comply with the [proof-of-loss] requirement." *Korn*, 382 F. App'x at 448.  Monarch is therefore entitled to summary judgment on this ground.

### B.     Claim for Total Disability

Monarch also argues that it is entitled to judgment on Valente's claim for total disability because Valente continued to work in some capacity as an attorney after his injury, from 2020 to at least 2022.  Valente argues that under the Policy language, his inability to do *trial* work entitles him to total disability benefits.

### 1.     Standard

Under Michigan law, insurance contracts are interpreted under the well-established principles of contract interpretation. *Singer v. Am. States Ins. (After Remand),* 245 Mich. App. 370, 374 (2001).  The central inquiry is to determine the intent of the parties. *Conagra v. Farmers State Bank,* 237 Mich. App. 109, 132 (1999).  Thus, disability insurance policies must be read "as a whole," giving

23

meaning to all of the terms.  *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566 (1992); *see also Wojciechowski v. Franklin Life Ins. Co.*, No. 228683, 2002 WL 1803918, at *2 (Mich. Ct. App. 2002) ("[T]he court must look at the contract as a whole and give meaning to all terms. . . .  This Court cannot create ambiguity where none exists.") (citing *Churchman,* 440 Mich. at 566-67) (unpublished).[6] Where the policy is unambiguous, its construction is a question of law for the court.  *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 353 (1999).

### 2.      Analysis

Here, the Policy provides that Valente would be considered "totally disabled" if he were *unable to do* the substantial and material duties of his regular occupation as a result of sickness or injury.  (ECF No. 18, PageID.151 (emphasis added)).  Further, Valente would be "residually disabled" if he could *do some, but not all*, of the substantial and material duties of his regular occupation as a result of sickness or injury.  (*Id*., PageID.152 (emphasis added)).

The distinction between total and residual disability was addressed in *Canu*, *supra*.  The policy in *Canu* contained similar language, providing that the plaintiff would be considered totally disabled if he is "unable to perform the material and substantial duties of [his] occupation due to . . . accidental injury . . . or . . .

---

[6] Mich. Ct. R. 7.215(C)(1) explains that "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis."

sickness."  In *Canu*, the district court explained the difference between total

disability and residual disability as follows:

> when a policy provides for both "total" and "residual" disability
> insurance benefits, the terms must be read in conjunction with one
> another.  When total and residual disability are read together in an
> insurance policy such as the one here, total disability requires that the
> insured be unable to perform *all* of his significant duties of his
> occupation.  *See, e.g.*, *Miller v. Northwestern Mut. Life Ins. Co.*, 392
> F.3d 973 (8th Cir. 2004); *Dym v. Provident Life and Acc. Ins. Co.*, 19
> F. Supp. 2d 1147, 1149–50 (S.D. Cal. 1998).  Any other interpretation
> would render the policies' residual disability provisions nugatory.  Such
> an interpretation would be inconsistent with Michigan's requirement
> that insurance contracts be read as a whole so as to give effect to every
> provision.  *Churchman,* 440 Mich. at 566.

*Id*.  So too here.  In order for Valente to show that he is totally disabled, he must

show that he is unable to perform all of his significant duties as an attorney.

Valente argues that by listing his occupation as "trial attorney," and no

longer being able to practice as a trial attorney specifically, he qualifies for total

disability benefits under the Policy language.  During Rose's deposition, Rohl

asked Rose the following hypothetical: if Valente had been a trial attorney 65% of

the time and mowed lawns 35% of the time, would his loss of the ability to work as

a trial attorney qualify for total disability under the Policy?  (ECF No. 21,

PageID.351).  Rose appeared to opine that this hypothetical claimant would not be

entitled to total disability, stating that if "he continues to mow lawns then he is not

totally disabled[.]"  (*Id*.).

Even assuming Rose's testimony as to her interpretation of the Policy is

incorrect, the hypothetical there does not track the claim in this case.  Valente's claim form clearly listed his occupation as "attorney," not "trial attorney."  (ECF No. 18-4, PageID.210).  He described his work as "trial attorney," handling "criminal, real estate and business matters[,]" "transaction negotiations; contracts; alternative dispute resolution; pre-trial litigation practices; bench and jury trials; post-adjudication matters; governmental agency petitions; and office management."  (*Id.*, PageID.212).  Assuming *arguendo* that Valente was in fact disabled from practicing in court, *i.e.* being a *trial* attorney, he has in fact continued to practice law as an attorney in many of the listed areas, as well as others, post-injury.  *See* ECF No. 22, PageID.960 (citing ECF No. 18-10, PageID.241-242, 244-247; ECF No. 19, PageID.319-22).  Valente has admitted that his prior work entailed transactional work, estate planning, and real estate work involving residential and commercial acquisitions, (ECF No. 18-10, PageID.241-242); and that he did work post-injury that included court appearances via Zoom, matters in probate court, a contract dispute, multiple criminal defense cases, and other real estate transactions, (*Id.*, PageID.244-247; ECF No. 19, PageID.319-322).

To that extent, Rohl suggested to Monarch at one point in the claim review that Valente "would like to take an 'intermediary position as [he] continues to work in a limited capacity.' "  (ECF No. 18-3, PageID.203, Monarch's Action

26

Log).  However, Valente never submitted a claim seeking residual disability benefits based on an alleged inability to perform work as a "trial attorney."

Valente's post-injury work in a legal capacity does not appear to differ substantially from what he claims his work was pre-injury.  Furthermore, to the point of the previous section, Monarch was unable to sufficiently verify what Valente's prior work entailed.  As a result, Monarch could not make a true comparison to distinguish his pre-injury trial work with his post-injury work as an attorney.  Nevertheless, under the clear language of the Policy, Valente does not qualify for total disability from Monarch as it is undisputed that he continued to perform substantial and material duties of an attorney, his listed occupation, after his injury.

## V.    Conclusion

For the reasons stated above, namely that (1) Valente failed to provide sufficient proof-of-loss documents, and (2) continued to work as an attorney after his injury and therefore cannot be considered totally disabled, Monarch's motion for summary judgment, (ECF No. 18), is GRANTED.  This case is DISMISSED.

SO ORDERED.

Dated: July 19, 2023                s/Kimberly G. Altman
Detroit, Michigan                   KIMBERLY G. ALTMAN
                                    United States Magistrate Judge

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 19, 2023.

<u>s/D. Tofil</u>
CAROLYN CIESLA
Case Manager